IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

TRISTA QUACKENBOSS,

                      Plaintiff,

      v.

MARTIN O'MALLEY,
Commissioner of Social Security,

                      Defendant.

OPINION AND ORDER

22-cv-582-slc

_____

      Plaintiff Trista Quackenboss seeks judicial review of a final decision of the Commissioner of the Social Security Administration[1], denying her claim for disability insurance benefits (SSDI) and supplemental security income (SSI) under the Social Security Act. 42 U.S.C. § 405(g). Quackenboss contends that the administrative law judge (ALJ) who denied her claim failed to adequately evaluate her mental limitations and her headaches, and failed to ensure that the vocational expert's job numbers testimony was reliable.  Because I am not persuaded that any of the issues raised by Quackenboss warrants remand, I am affirming the Commissioner's decision denying Quackenboss benefits.

FACTS

      The following facts are drawn from the Administrative Record (AR), filed with the Commissioner's answer in this case:

## I. Background

      Quackenboss alleges that she cannot work because of limitations caused by her chronic conditions of fibromyalgia, migraines, depression, anxiety, and borderline personality disorder. (She has some other impairments, including mild degeneration of her lumbar spine and sacroiliac joints, but Quackenboss doesn't argue that they are disabling, so this court won't discuss them.)

---

[1] I have substituted the name of the newly-appointed commissioner in the caption.

Medical records show that Quackenboss has struggled with these conditions for several years and has been treated for them on a regular and fairly routine basis. Her medical care has consisted of medications, behavioral counseling, and some physical therapy, along with Botox injections every 12 weeks for her migraines.  In mid-February 2022, Quackenboss received three days of inpatient treatment after admitting herself for suicidal ideation. Quackenboss's last full time job, as a medical receptionist, ended in 2018.

In July and September 2020, Quackenboss filed SSI and SSDI applications for a period of disability beginning on December 1, 2019, when she was 33 years old. After the local disability agency denied her claims initially and on reconsideration, Quackenboss requested a hearing, which was held telephonically on April 13, 2022, before ALJ Guila Parker. Quackenboss appeared with counsel and testified.

Quackenboss testified that she was unable to work due to a combination of her mental and physical impairments. She said that she had struggled to perform the medical receptionist job and missed many days of work because of pain, social anxiety, and panic attacks. At the time of the hearing, she was working for Door Dash, which allowed her the flexibility to set and adjust her schedule depending on how she felt. Quackenboss testified that she had daily pain, dizziness and balance problems, fatigue, headaches, and had trouble focusing and completing tasks.  She was taking duloxetine to treat her depressive disorder and anxiety, and she was about to restart therapy for these conditions. Quackenboss testified that she also needed therapy for her borderline personality disorder, which interfered with her ability to get along with others. Quackenboss said the Botox injections had helped her headaches, but that she still had migraines about seven or eight days a month. She said that when she had a bad migraine, she could not work.  AR 48-68.

The ALJ also heard testimony from a vocational expert.  Relevant facts concerning that testimony are described later in this opinion.

## II. ALJ Decision

After the hearing, the ALJ issued a written decision denying Quackenboss's request for benefits, following the five-step sequential evaluation process set forth in the regulations. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).   The ALJ first found that Quackenboss had not engaged in substantial gainful activity after her alleged onset date. AR 17.   At step two, the ALJ determined that Quackenboss had the severe impairments of mild degenerative disc disease of the lumbar spine, mild degenerative joint disease of the sacroiliac joints, fibromyalgia, migraines, depression, anxiety and borderline personality disorder. *Id*.

At step three, the ALJ found that Quackenboss's impairments were not severe enough to meet or medically equal the criteria for a listed disability.   In evaluating Quackenboss's mental impairments at this step, the ALJ considered whether the "paragraph B" criteria of the listings were satisfied, which required her to rate Quackenboss's degree of limitation in four broad areas of functioning. The ALJ concluded that Quackenboss's psychological impairments resulted in a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting or maintaining pace; and a moderate limitation in adapting or managing herself. AR 19-20. Because Quackenboss had neither an "extreme" limitation in one area nor a "marked" limitation in two areas, she did not meet the criteria of any listed psychological impairment.

Next, the ALJ assessed Quackenboss's residual functional capacity (RFC), taking into account the medical evidence and various medical opinions in the file as well as statements from Quackenboss and third parties concerning her functional abilities and daily activities. The ALJ determined that Quackenboss was capable of performing work at the light level of exertion with a number of additional limitations that the ALJ deemed necessary to account for Quackenboss's headaches, including reductions on noise and light intensity and workplace hazards. AR 21, 28. The ALJ also assessed Quackenboss's mental abilities, concluding that she could: maintain

3

concentration, persistence, and pace sufficient to carry out simple tasks for two-hour intervals over an 8-hour day with customary scheduled breaks; work in a low-stress job, defined as one that requires only occasional work-related decisions and involves only occasional changes in the work setting; and could occasionally interact with supervisors, co-workers, and the public. AR 21.

The ALJ then summarized Quackenboss's claims and allegations, and the medical record. The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR 24. The ALJ determined that the medical record failed to fully substantiate Quackenboss's allegations of disabling symptoms, AR 24, and that Quackenboss's activities suggested better functioning than she claimed. AR 26.  As the ALJ observed, Quackenboss was able to work part-time and was independent with activities of daily living such as preparing simple meals, doing laundry and cleaning.  In addition, she reported a wide range of additional activities which included reading, sewing, watching television, hiking, driving, camping, making jewelry, traveling out of state, going to a music festival, and caring for her child.  Quackenboss does not challenge the ALJ's evaluation of her subjective complaints in this appeal.

The ALJ also considered numerous medical opinions, including opinions from Quackenboss's treating providers and from state agency consultants who reviewed Quackenboss's applications.  The ALJ evaluated the persuasiveness of these opinions in her decision. AR 27-31.  For each opinion, the ALJ explained the reasons for her conclusion and why she was or was not agreeing with the evaluator's assessment of Quackenboss's limitations. *Id*.

Relying on the vocational expert's testimony, the ALJ found that Quackenboss's limitations prevented her from performing her past work as a medical clerk, which was a semi-

4

skilled job. AR 31. However, the ALJ found that Quackenboss was not disabled under the Social Security Act because she was able to perform jobs existing in significant numbers in the national economy, namely: mail clerk (37,000 jobs), routing clerk (62,000 jobs), and inspector and hand packager (105,000 jobs). The ALJ noted that Quackenboss's lawyer had objected to the vocational expert's testimony on the ground that her methodology for estimating job numbers was not reliable; the ALJ overruled this objection and found the VE testimony to be reliable. AR 32-33. This led the ALJ to conclude that Quackenboss was not disabled at any time from her onset date through the date of her decision. The Appeals Council declined to review the ALJ's decision, making that decision the final decision of the Acting Commissioner for purposes of judicial review.

OPINION

The court reviews an ALJ's decision on disability benefits under a substantial-evidence standard. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 587 U.S. ——, 139 S. Ct. 1148, 1152 (2019). Substantial evidence is not a high threshold; it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154 (internal citations omitted). To determine whether substantial evidence exists, the court reviews the record as a whole. *Id*. If reasonable minds could differ, the court defers to the ALJ's judgment and weighing of the evidence. *See Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

To permit informed review of the administrative findings, an ALJ must build "an accurate and logical bridge" between the evidence and the result. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). However, the ALJ need only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *see also Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the

5

reasoning behind her decision to deny benefits."); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (describing articulation requirement as "lax"). In reviewing an ALJ's decision for fatal gaps or contradictions, the court reads the decision as a whole and with common sense rather than nitpicking at it. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).

Quackenboss challenges the ALJ's decision on four grounds:

(1) The ALJ failed to properly apply the listings for mental impairment

(2) The ALJ gave inadequate consideration to Quackenboss's headaches

(3) The ALJ failed to sufficiently tie her RFC finding to the evidence in the record

(4) The ALJ's step five finding is not supported by substantial evidence because the vocational expert's testimony was not reliable

As explained below, I find conclude that none of these grounds suffices to warrant remand.

**(1) Listings for Mental Impairments**

Quackenboss argues that ALJ Parker erred at the third step of the sequential evaluation by "ignoring relevant clinical signs and findings" when she evaluated the severity of Quackenboss's mental impairments. To assess the severity of a mental impairment, the ALJ is required to rate the claimant's functioning in four broad areas known as the "paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *See Craft v. Astrue*, 539 F.3d 668, 674–75 (7th Cir. 2008) (describing "special technique" used to assess mental impairments); 20 C.F.R. §§ 404.1520a, 416.920a. For a mental impairment to be presumptively disabling, the claimant generally must either have "marked" limitations in two of the four areas, or an "extreme" limitation in one area. *See, e.g.*, 20 C.F.R. § 404, Subpart P, App. 1, §§ 12.04(B), 12.06(B), 12.08(B). The claimant bears the burden to show that her

impairment satisfies all of the various criteria specified in the listings. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999); *see also Sullivan v. Zebley*, 493 U.S. 521 (1990).

Quackenboss's challenge is limited to the functional area of concentration, persistence, or pace (CPP). The ALJ determined that Quackenboss had "moderate" limitations in this area, explaining:

> She asserted having concentration deficits and difficulty completing tasks. The record indicates the claimant reported sleep disturbance, which could negatively affect her functioning in this area. However, the record reflects that the claimant was able to engage in activities demanding some ability to see a task through to completion and sustain focus and attention. Such activities included driving a car, working part-time as a delivery driver, shopping for food, preparing simple meals, caring for her child, cleaning, and doing laundry. In addition, during a consultative examination she demonstrated no apparent problem following the conversation at any point during the assessment. Further, she regularly demonstrated no abnormalities in attention or concentration. Therefore, the undersigned finds a moderate limitation in this area.

AR 20 (record citations omitted).

Quackenboss doesn't challenge the ALJ's reliance on her activities, nor does she deny that she regularly demonstrated no abnormalities in attention or concentration during mental assessments. Instead, she argues that the ALJ's evaluation is flawed because (1) she considered only "concentration" and overlooked Quackenboss's limitations in persistence and pace; and (2) she didn't consider Quackenboss's migraines or dizziness. Neither argument is persuasive.

First, the ALJ did not overlook Quackenboss's alleged limitations in persistence and pace. Quackenboss supports her claim that she has more severe limits than the ALJ found by citing a function report that she completed on October 17, 2020. There, Quackenboss described how fatigue, fibromyalgia flare-ups, and depression required her to pace herself and made it difficult to attend work on a consistent basis.

But the ALJ *did* consider this evidence: she cited the exhibit number of the function report (B11 E) after stating that Quackenboss "asserted having concentration deficits and difficulty completing tasks." In addition, later in her decision, the ALJ specifically rejected Quackenboss's complaints of disabling "fatigue and concentration" deficits, finding that they were (a) inconsistent with numerous medical notes documenting that Quackenboss was observed to be alert and oriented, with no noted abnormalities in attention, concentration or memory, and (b) inconsistent with various activities noted in the record, which, in addition to those cited above, included playing video games, throwing a football, shooting hoops, hiking, board games, camping, traveling out of state, vacationing with her parents, playing with her child, attending festivals and walking for exercise. AR 26. Contrary to Quackenboss's contention, the ALJ's discussion adequately establishes that the ALJ considered all of the important evidence and that she expressly considered Quackenboss's ability to "see a task through to completion and sustain focus and attention", *i.e.* persistence and pace, in arriving at the conclusion that Quackenboss had only moderate limitations in work functions related to concentration, persistence and pace.

Second, the ALJ considered Quackenboss's headaches. Although headaches do not have their own listing, the Social Security Administration has instructed that Listing 11.02 (Epilepsy) is most analogous for evaluating migraines, noting that a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in paragraphs B or D of Listing 11.02 for dyscognitive seizures. SSR 19-4p, 2019 WL 4169635, at *7. The ALJ acknowledged this in her decision, but she found that the evidence in the record failed to show that Quackenboss's headaches were severe enough to be equivalent to a listed impairment. AR 19.

Quackenboss has not specifically argued that the ALJ erred in determining that her migraines did not medically equal the criteria in Listing 11.02. Instead, she seems to be contending that the ALJ committed legal error by failing to consider the effects of either

migraines or dizziness as part of the "paragraph B" assessment of Quackenboss's mental disorders. However, the social security regulations indicate that the criteria in paragraph B "describe *impairment-related* functional limitations," meaning related to the particular mental disorder substantiated by the criteria in paragraph A. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 A. The language of the regulations does not support Quackenboss's theory that an ALJ can use limitations posed by a claimant's neurological disorder to determine whether any of her mental disorders are presumptively disabling. Accordingly, I find no error by the ALJ at step three of the evaluation process.

This is not to say that the ALJ was entitled to ignore mental work-related limitations simply because they may have resulted from a non-mental disorder. Plainly, a person suffering from episodic headaches, or any other painful condition, could have difficulty concentrating and persisting at tasks, including attending work on a reliable basis. I address Quackenboss's challenge to the ALJ's assessment of her headaches next:

## II. Evaluation of Headaches

Quackenboss contends that the ALJ erred in rejecting an opinion from Kelli Tornstrom, a nurse who regularly administered Quackenboss's Botox injections. According to Tornstrom, Quackenboss had severe, chronic migraine headaches accompanied by visual disturbances, malaise, photophobia, phonophobia, lightheadedness, jitteriness and then passing out. AR 632-33. Tornstrom indicated that Quackenboss had more than 15 headaches a month that were greater than four hours in duration. Tornstrom opined that, because of episodic headaches, Quackenboss could be off-task for 15 percent of the work day, would need to take unscheduled breaks, and would miss about two days of work per month. AR 636-37.

The ALJ evaluated Tornstrom's opinion in accordance with the updated regulations for evaluating medical opinions, focusing on supportability and consistency. *See* 20 C.F.R §

404.1520c(b)(2) ("The factors of supportability ... and consistency ... are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions ... to be."). The ALJ found Tornstrom's opinions not persuasive, finding them neither well-supported nor consistent with the overall record. The ALJ explained that Tornstrom had not supported her opinions with reference to objective criteria, nor had she clearly explained the basis for them. AR 29.

In addition, the ALJ found Tornstrom's opinions to be inconsistent with: (1) the overall medical record, which showed that Quackenboss regularly presented to her providers as alert and oriented, with no abnormalities in attention or concentration; (2) Quackenboss's broad range of daily activities; and (3) Quackenboss's reported significant benefit from the Botox injections, which reportedly reduced her headaches by 50 percent. AR 29.

Quackenboss argues that the ALJ's third finding was wrong because Tornstrom's opinion accounted for the frequency and severity of Quackenboss's headaches *with* the Botox injections. Quackenboss points to records indicating that without the Botox injections, she had headaches every day. *See* AR 992 (noting that when Quackenboss had not been able to get Botox treatments for a time period when she was living in Nevada, her headaches had "returned to previous level with every day all day headaches and at least 10 migraines per month"); AR 709 (indicating that prior to Botox, Quackenboss was having "near daily" headaches, many of them severe).

I agree that these records suggest that Tornstrom was opining about Quackenboss's ability to work and the frequency of her headaches when she was receiving Botox treatments. At the same time, however, I am not persuaded that the ALJ was wrong to contrast Tornstrom's opinion with the reports indicating that Quackenboss received significant benefit from the Botox injections. According to those records, Quackenboss still had headaches on about half the days each month, but only had severe migraine headaches once or twice a month. AR 711, 729. So

10

to the extent Tornstrom's opinion seemed to suggest that even with Botox Quackenboss had 15 or more *severe* headaches a month, the ALJ correctly found this was inconsistent with the reports that indicated otherwise.

Moreover, the ALJ cited other reasons besides Quackenboss's reported improvement on Botox as bases for discounting Tornstrom's opinions concerning Quackenboss's ability to stay on task and to attend work on a regular basis. The ALJ also relied on evidence that Quackenboss appeared alert and oriented at numerous medical visits and regularly presented to her providers with no abnormalities in attention or concentration. The ALJ also relied on Quackenboss's wide variety of daily activities, which she permissibly concluded showed better functioning than Tornstrom indicated. In addition, the ALJ noted that Tornstrom had not supported her opinion with references to any objective criteria.

Quackenboss raises no challenge to any of these other findings, nor does she argue that the ALJ failed to properly evaluate Tornstrom's opinion in accordance with the regulations. For example, she doesn't argue that it was improper for the ALJ to rely on Quackenboss's general appearance and ability to pay attention and concentrate at medical visits, or to contrast her wide and varied activities with her complaints of debilitating conditions, including migraines. Collectively, the reasons cited by the ALJ for rejecting Tornstrom's opinion are sufficient to support her determination. Accordingly, this court must defer to the ALJ's assessment. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (ALJ must "provide some evidence supporting her determination," but not all of her reasons need be supported by the record).

III.  **RFC Assessment**

Quackenboss next argues that the ALJ committed various errors in assessing Quackenboss's specific mental abilities when arriving at her RFC determination at step four. An ALJ's RFC findings are intended to capture "the most [a claimant] can still do despite [her]

limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also Moon v. Colvin*, 763 F.3d 718, 720 (7th Cir. 2014), as amended on denial of reh'g (Oct. 24, 2014) ("Residual functional capacity is the extent to which a person can still work despite having health problems."). As noted above, ALJ Parker determined that despite of Quackenboss's health problems, Quackenboss nonetheless could: maintain concentration, persistence, and pace sufficient to carry out simple tasks for two-hour intervals over an 8-hour day with customary scheduled breaks; work in a low-stress job, defined as one that required only occasional work-related decisions and involved only occasional changes in the work setting; and occasionally interact with supervisors, co-workers, and the public.

Most of Quackenboss's arguments contest the adequacy of the "bridge" between the evidence and these conclusions. First, she contends that the ALJ's mental RFC assessment must be reversed because the ALJ drew medical conclusions without wholly adopting any of the medical opinions in the record. I can dispense with this contention quickly. The ALJ isn't required to adopt a particular medical opinion to support the RFC. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). Rather, in assessing a claimant's RFC, the ALJ must "incorporate all of the claimant's limitations supported by the medical record" and provide enough reasoning to allow the court to understand the basis for her conclusions. *See Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021); *Crump v. Saul*, 932 F. 3d 567, 570 (7th Cir. 2019); *Hughes v. Kijakazi*, No. 21-CV-367-SLC, 2022 WL 4103194, at *9 (W.D. Wis. Sept. 8, 2022); *see also Fanta v. Saul*, 848 Fed. App'x 655, 658 (7th Cir. 2021) (quoting 20 C.F.R. § 404.1527(d)(2)) ("An ALJ has 'final responsibility' for determining a claimant's residual functional capacity and need not adopt any one doctor's opinion.").

Quackenboss perfunctorily asserts that the ALJ was required to call a medical expert if she was not going to adopt any of the opinions in the file. This argument is undermined by the regulations: while an ALJ has the *discretion* to seek medical evidence from expert medical sources,

*see* 20 C.F.R. § 404.1513a(b)(2), she is not *required* to do so. In this case, the ALJ had a multitude of medical records documenting Quackenboss's mental impairments and her mental status, and Quackenboss hasn't identified anything in the record that required further evaluation, or that was beyond the ability of a lay person to understand. As the ALJ's RFC assessment makes clear, her determination that Quackenboss was able to stay on task sufficiently to perform low-stress, simple jobs with limited personal interaction was based largely on treatment notes and mental status evaluations showing few abnormal findings and on Quackenboss's wide array of documented activities. I am satisfied that assessing this evidence was within the ALJ's capacity as a layperson. *See Callaway v. Saul*, No. 19-CV-818-JDP, 2020 WL 2214385, at *2 (W.D. Wis. May 7, 2020) (medical expertise not required where evidence can be understood by a layperson).

Next, Quackenboss asserts that the ALJ failed to adequately explain how she arrived at her mental RFC assessment of Quackenboss. She accuses the ALJ of merely summarizing Quackenboss's medical records without analyzing them. As Quackenboss correctly notes, if an ALJ's discussion of the medical evidence consists mostly of summary without analysis or explanation of how the evidence supports the ALJ's RFC determination, then courts will often remand the case for failure to comply with the articulation requirement. *See, e.g., Plemon v. Kijakazi*, No. 21-CV-148-JDP, 2022 WL 842914, at *3 (W.D. Wis. Mar. 22, 2022) (citing cases).

But the ALJ did not do that here. Quackenboss's argument overlooks the ALJ's discussion on pages 13-14 of her decision (AR 26-27), where she contrasted Quackenboss's complaints of disabling mental symptoms with her presentation at medical visits and with her actual functioning as reflected by her activities. The ALJ specifically addressed Quackenboss's alleged fatigue and concentration deficits, difficulty getting along with others, difficulty understanding and remembering things, anxiety and panic attacks, and suicidal ideation. With respect to each

13

alleged limitation, the ALJ contrasted Quackenboss's allegations that her limitations were disabling with evidence in the record showing otherwise. With respect to getting along with others, for example, the ALJ noted that Quackenboss consistently appeared at appointments with normal behavior and was described as cooperative; admitted living with and spending time with others, including in a household with roommates and several children; traveled to visit people; and attended music festivals. The ALJ also assessed each of the medical opinions and explained why and to what extent she found them persuasive, relying on this same evidence. The path of the ALJ's reasoning is plain from her decision.

Quackenboss next argues that the ALJ's RFC assessment failed to adequately capture the ALJ's own finding at step three that Quackenboss had "moderate" limitations in CPP. Quackenboss is correct that "boilerplate 'limitations of concentration, persistence, and pace' including limiting a claimant's abilities to 'simple, routine tasks that do not require constant interactions with coworkers or the general public' *may* be insufficient to address a claimant's capacity." *Recha v. Saul*, 843 F. App'x 1, 4 (7ᵗʰ Cir. 2021) (quoting *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009)) (emphasis added).  But the Seventh Circuit's recent case law has clarified that "an ALJ has some latitude with the exact wording of an RFC as long as it conveys in some way the restrictions necessary to address a claimant's limitations." *Id*.; *see also Weber v. Kijakazi*, No. 20-2990, 2021 WL 3671235, at *5 (7ᵗʰ  Cir. Aug. 19, 2021) ("[T]here is no categorical rule that an ALJ may never accommodate 'moderate' limitations in concentration, persistence, and pace with only a restriction to simple tasks.") (citing *Lothridge*, 984 F.3d at 1234); *Pytlewski v. Saul*, 791 F. App'x 611, 616–17 (7ᵗʰ Cir. 2019) (ALJ adequately captured claimant's moderate limitations in concentration, persistence and pace caused by anxiety, depression, and anger issues by limiting his interaction with people and restricting him from making high-stakes decisions). The key question is whether the RFC addresses the "claimant's limitations supported by the medical record." *Crump*, 932 F.3d at 570.

Here, as in *Pytlewski*, I am satisfied that the ALJ adequately captured the limitations posed by Quackenboss's depression, anxiety, and borderline personality disorder. The ALJ's RFC assessment acknowledged that Quackenboss's mental impairments were exacerbated by stress and that Quackenboss had some difficulties with personal interaction. At the same time, as already discussed, the ALJ cited substantial evidence that contradicted Quackenboss's allegations that her limitations were disabling. It is plain that the ALJ's RFC assessment was based on a considered evaluation of the medical record and that she didn't simply "assume" that Quackenboss's moderate CPP limitations meant that she could perform simple, unskilled work. Rather, the ALJ tailored the RFC to the limitations adequately supported by the medical record.

Nevertheless, Quackenboss argues that the ALJ's discussion was insufficient because: the ALJ failed to explain why she found that Quackenboss could have occasional interactions with others, rather than prohibiting her from having any contact with the general public; she failed to explain why Quackenboss could perform simple tasks, rather than none at all; and she failed to explain why Quackenboss could handle occasional work-related decisions instead of none at all. This argument flips the evidentiary burden on its head.

It was not the ALJ's responsibility to conclusively prove that Quackenboss *wasn't* disabled. Quackenboss bore the burden of proof "through step four" of the five-step process. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000); *Weaver v. Berryhill*, 746 F. App'x 574, 578–79 (7th Cir. 2018) ("It was Weaver's burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work.") (citation omitted). In other words, the ALJ was only required to address evidence provided by Quackenboss that supported specific restrictions; she was not required to also *disprove* that Quackenboss did not have greater restrictions. *Accord Bleuer v. Kijakazi*, No. 22-CV-00351-SCD, 2023 WL 9788489, at *4 (E.D. Wis. Mar. 28, 2023) ("The ALJ did not have to explain why

15

Bleuer could use her hands frequently and also conclusively disprove that Bleuer could use her hands only occasionally.").

Critically, Quackenboss has failed to identify medical evidence that would compel a greater level of restriction than that found by the ALJ. *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (A claimant is not entitled to remand if he "does not identify medical evidence that would justify further restrictions."); *see also Gedatus v. Saul*, 994 F.3d 893, 904 (7th Cir. 2021) ("A fundamental problem is that [plaintiff] offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set."); *Delong v. Saul*, 844 F. App'x 894, 900 (7th Cir. 2021) ("[E]ven if the record could support such limitations, there is nothing that compels them."). She relies largely on her diagnoses (anxiety, depression, and borderline personality disorder), but the fact that Quackenboss was diagnosed with these impairments does not mean that they imposed particular restrictions on her ability to work. *See Schmidt v. Barnhart*, 395 F.3d 737, 745–46 (7th Cir. 2005).

Quackenboss also points out that she was hospitalized twice for suicidal ideations, had a history of cutting herself, and appeared depressed, anxious, tearful or sad during some examinations. First, Quackenboss fail to explain why these facts would preclude her from performing work within the RFC. Second the ALJ considered this evidence: she noted that one of the hospitalizations was alcohol-related and that Quackenboss regularly presented to her providers with intact judgment and good insight, and without any suicidal ideation. AR 27. And–again–the ALJ found that Quackenboss's documented activities showed that she was "engaging in better functioning than one would expect given her allegations of disabling symptoms"—a finding that Quackenboss has not challenged.

Finally, Quackenboss suggests that the ALJ erred by arriving at her RFC assessment before considering the medical opinions. I disagree. This case is distinguishable from *Pytlewski*, 791 F. App'x 611, where the court criticized (but did not reverse) the ALJ for "engag[ing] in

16

circular reasoning when he evaluated the weight of medical opinions based on their consistency with the RFC assessment," *id*. at 617. Here, the ALJ evaluated the medical opinions based on their supportability and consistency with the other evidence in the record, in accordance with the commissioner's updated rules for evaluating medical opinions. *See* 20 C.F.R. §§ 404.1520c, 416.920c. The mere fact that the ALJ awkwardly stated her RFC conclusion before discussing the medical opinions does not suggest that she forced the medical opinions into a "foregone conclusion," *Pytlewski*, at 617. Further, it's not clear whether concerns about how the ALJ "weighed" the medical opinions even apply under the commissioner's new regulations. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (providing that agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.").

In sum, as with most disability claims, the record before the ALJ presented a mix of evidence, some of which supported Quackenboss's claim, and some of which did not. The task of weighing this conflicting evidence fell on the ALJ. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Overall, the ALJ supported her mental RFC assessment with substantial evidence and a logical explanation. Because Quackenboss has failed to point out any significant evidence the ALJ failed to address or identify additional limitations compelled by the record, I will not overturn the ALJ's RFC assessment.

**IV. Step Five Determination**

At the hearing, the ALJ elicited testimony from a vocational expert, Julie Sliga, to determine whether there were jobs that a person with Quackenboss's limitations could perform, and if so, how many of those jobs existed in the national economy. In response to a hypothetical that included the RFC limitations that the ALJ would ultimately adopt in her decision, Sliga identified three examples of unskilled jobs in the Dictionary of Occupational Titles that the

hypothetical individual could perform: mail clerk ( ≈37,000 jobs); routing clerk (≈62,000 jobs); and inspector and hand packager, (≈105,000 jobs). AR 70. Sliga testified that customarily, an employee in these jobs could not be off task for more than 10 percent during the workday or be absent more than eight to 10 days a year. AR 70-71. Sliga later testified that her testimony was consistent with the job requirements listed in the Dictionary of Occupational Titles, except that in regard to limitations on social interactions, tolerance for time-off-task behavior, and absenteeism, she had relied on her training and experience. AR 79.

The ALJ asked Sliga how she estimated the job numbers. AR 71. Sliga responded that she relied on the Occupational Employment Quarterly (OEQ), which is a private source that collects data from the United States Department of Labor's Bureau of Labor Statistics (BLS)and the Census Bureau.[2] *Id*.

Sliga elaborated on her methodology during cross-examination: she testified that the Department of Labor gathers data for jobs classified under what are known as the Standard Occupational Classification (SOC) codes, whereas the OEQ gathers data using a census code. AR 74. Sliga explained that the census codes used in the OEQ were "relatively comparable" to the SOC codes used by the Department of Labor. AR 75.  Sliga acknowledged that the SOC codes from which her job numbers were derived included multiple DOT codes within each grouping, but she said that she had narrowed the jobs down to those that were light and unskilled. AR 77-78. She also said that she had consulted a second source, a computer program called SkillTRAN, to obtain the percentage of jobs that were full time, and then applied that percentage to the number of jobs she had obtained from the OEQ. AR 74.  According to Sliga,

---

[2]The OEQ uses data from the Bureau of Labor Statistics and the Census to provide current jobs data reported by Standard Occupational Classification (SOC) code, as well as a crosswalk manual that allows users to see the DOT codes included in each SOC grouping. See https://www.uspublishing.net/ oeqii_page.html (visited March 18, 2024). The OEQ estimates the number of jobs for each DOT code by using the "equal distribution method," which "divides the number of jobs estimated for an SOC code by the number of DOT titles contained within that SOC code." *Ruenger v. Kijakazi*, 23 F.4th 760, 762 (7th Cir. 2022).

her method of estimating job numbers was widely used in her field and represented a conservative estimate given the absence of a single source providing exact job numbers for each DOT code.

In her decision, ALJ Parker relied on Sliga's testimony to find at the fifth step of the sequential evaluation that Quackenboss could perform a substantial number of jobs in the national economy. AR 32.  The ALJ concluded that Sliga's methodology for estimating job numbers was reliable.  Although the ALJ's discussion consists largely of a summary of Sliga's testimony without much analysis, the ALJ noted that Sliga has professional knowledge and experience in job placement, explained the source of the OEQ numbers and how she had adjusted them, described the estimates as "conservative," and said that using the OEQ numbers in this fashion was a widely used methodology by vocational experts.

On appeal, Quackenboss argues that the ALJ did not do enough to ensure that the VE's job estimates were reliable.  Her briefing on this point reads something like a greatest hits compilation of quotes from other cases addressing VE testimony, so it's not easy to make out her precise argument.  As best I can tell, Quackenboss contends that Sliga's methodology was flawed because she obtained her job numbers from the OEQ, which in turn relies on the equal distribution method.  The Seventh Circuit has questioned the reliability of the equal distribution method based on its "illogical assumption that all job titles within a particular DOT job group exist in equal numbers in the national economy." *Chavez v. Berryhill*, 895 F.3d 962, 966 (7th Cir. 2018).  But the court has not enjoined use of the method to estimate job numbers; instead, it has held that an ALJ may rely on whatever method is used, so long as it is "supported with evidence sufficient to provide some modicum of confidence in its reliability." *Id*. at 969-70. As Judge Peterson recently explained, "[t]he problem in *Chavez* was that, even after persistent questioning, the VE had failed to offer an affirmative explanation for his conclusion that the 108,000 jobs produced by the equal distribution method was a more reliable estimate than the

800 jobs produced by JobBrowser Pro software, which used an occupational density method."
*Golombiski v. Kijakazi*, No. 22-CV-440-JDP, 2023 WL 6314643, at *6 (W.D. Wis. Sept. 28, 2023).

Here, in contrast to *Chavez*, Sliga offered an affirmative explanation for her conclusion that the job estimates she derived from the OEQ were reliable. She testified that her use of the OEQ to estimate job numbers was a reasonably accepted approach in the field of vocational rehabilitation, that the OEQ derived its numbers from reliable government data, and that, in her professional opinion, her job number estimates were "conservative." Quackenboss suggests that the ALJ should have asked Sliga more questions, but Sliga's testimony was adequate to provide "some modicum of confidence" in the reliability of her job numbers, so the ALJ did not need to do more. *See Fetting v. Kijakazi*, 62 F.4th 332, 339 (7th Cir. 2023) (where vocational expert's testimony was sufficiently cogent for ALJ "to understand the sources of his data and the general process he adopted," ALJ could rely on it); *Golombiski*, 2023 WL 6314643, at *6 (affirming similar testimony).

Next, Quackenboss argues that Sliga's testimony was unreliable because she identified only light, unskilled jobs without accounting for the additional non-exertional limitations included in the ALJ's hypothetical, such as restrictions on noisy environments, working around hazards and low-stress work. Quackenboss infers this omission from Sliga's testimony that, when using the OEQ to estimate the number of jobs available in each of the three *DOT* job titles she identified, she had eliminated jobs that were not light or unskilled. The problem with Quackenboss's argument is that Sliga was explaining how she estimated job *numbers* for the occupations she identified, *not* how she determined hypothetical-appropriate occupations in the first place. As for that testimony, Quackenboss never challenged it.

Quackenboss now argues for the first time on appeal that some of the jobs identified by Sliga, as described in the *DOT,* appear to conflict with the restrictions set out in the

hypothetical.  Because the ALJ complied with her obligation to ask Sliga whether her testimony was consistent with the information in the *DOT*, and because Quackenboss did not identify any apparent conflicts at the time of hearing, Quackenboss now must demonstrate "that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance." *Surprise v. Saul*, 968 F.3d 658, 662 (7th Cir. 2020) (quoting *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)).  Quackenboss has failed to do so.

Quackenboss raises two challenges: first, she argues that the job of mail clerk as described in the Dictionary of Occupational Titles is at odds with an RFC for simple work because it requires a reasoning level of 3 on the *DOT*'s General Education Development scale. But the Seventh Circuit has said that there is no apparent conflict between a simple tasks limitations and level 3 reasoning.  *Sawyer v. Colvin*, 512 F. App'x 603, 610–11 (7th Cir. 2013).  Second, Quackenboss contends that the job of inspector/hand packager is beyond her abilities because it is rated as  "Level-4-Loud" noise intensity.  It's unclear where the *DOT* says this, so I can't conclude that the conflict was so obvious that the ALJ should have discovered it for herself. And even if Quackenboss is correct, that would only eliminate the inspector/hand packager jobs. Approximately 99,000 jobs nationwide would remain, well above what courts in this circuit, including this one, have found significant.  *See, e.g., Wegerer v. Kijakazi*, No. 22-CV-123-JDP, 2023 WL 6307407, at *7 (W.D. Wis. Sept. 28, 2023) (23,600 jobs); *Sommerfeldt v. Kijakazi*, 21-cv-83-jdp (W.D. Wis. Sept. 12, 2022) (27,500 jobs); *Smith v. Kijakazi*, No. 22-CV-163-SLC, 2023 WL 4579444, at *8 (W.D. Wis. July 18, 2023) (17,000 jobs).

In sum, Quackenboss has failed to show that the vocational expert's testimony was unreliable. Accordingly, the ALJ properly relied on it as a basis for her conclusion that there were a substantial number of jobs in the national economy that Quackenboss could perform in spite of her limitations. The ALJ's decision will be affirmed.

ORDER

IT IS ORDERED that the decision of the Commissioner of Social Security denying Trista Quackenboss's applications for social security benefits, is AFFIRMED.  The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 25th day of March , 2024.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge